UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:24-cv-60382-DSL

JESSICA PIAFSKY, an individual,

Plaintiff,

v.

MB HOME IMPROVEMENTS INC. a Florida Corporation, MAXIM BOHADANA, an Individual, ROI NEEMAN, an Individual and CONSTRUCTION FORT LAUDERDALE, INC. d/b/a MB HOME IMPROVEMENTS, a Florida Corporation,

Defendants

**MOTION FOR LEAVE TO AMEND COMPLAINT**

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:24-CV-60382

(Jury Trial Demanded)

JESSICA PIAFSKY, an individual,
Plaintiff,

v.

MB HOME IMPROVEMENTS INC. a Florida corporation, MAXIM BOHADANA, an individual, ROI NEEMAN, an individual and CONSTRUCTION FORT LAUDERDALE INC. d/b/a MB HOME IMPROVEMENTS, a Florida corporation,
Defendants

**FIRST AMENDED COMPLAINT**

Plaintiff, JESSICA PIAFSKY, by and through undersigned counsel, sues Defendants MB HOME IMPROVEMENTS INC., MAXIM BOHADANA, ROI NEEMAN ("NEEMAN", and CONSTRUCTION FORT LAUDERDALE INC. doing business as MB Home Improvements ("CFL", together with MB, BOHDANA and NEEMAN collectively referred to as the "Defendants"), and alleges as follows:

**INTRODUCTION**

1. This is an action for damages arising from the Defendants' breach of contract and for their wrongful, negligent, and fraudulent acts in performing renovations to the Plaintiff's property at 3272 SW 51st Street, Hollywood, Florida (the "**Property**") with damages estimated to be in excess of $200,000.00 exclusive of interest, costs, statutory damages and attorneys' fees.

## PARTIES

**Plaintiff Jessica Piafsky:**

2. Plaintiff, JESSICA PIAFSKY ("Plaintiff" or "PIAFSKY"), is an individual who is a resident of the State of New York, County of Nassau, who, owns property in Broward County, Florida, and is *sui juris*.

**Defendant MB Home Improvements Inc.:**

3. Defendant MB HOME IMPROVEMENTS INC. ("MB") is a Florida Corporation with its principal place of business in Broward County, Florida.

4. MB is licensed by the State of Florida as a Certified Roofing Contractor, Certified Building Contractor and a Construction Business Information.

5. At all times relevant hereto, MB regularly conducted business within Broward County, Florida.

**Defendant Maxim Bohadana:**

6. Defendant MAXIM BOHADANA ("BOHADANA"), is an individual who, upon information and belief, is a resident of Broward County, in the State of Florida and is *sui juris*.

7. BOHADANA is licensed by the State of Florida as, *inter alia¸* a Certified Roofing Contractor and a Certified Building Contractor.

8. BOHADANA does business under the alias "MB Home Improvements."

9. At all times relevant hereto, BOHADANA regularly conducted business within Broward County, Florida.

10. At all times relevant hereto, BOHADANA was and remains the President of MB.

11. Upon information and belief, at all times relevant hereto, BOHADANA was and remains the sole shareholder of MB and that MB is alter ego for BOHADANA.

**Defendant Construction Fort Lauderdale, Inc.:**

12. Defendant CONSTRUCTION FORT LAUDERDALE INC. ("CFL"), is a Florida Corporation with its principal place of business in Broward County, Florida.

13. At all times relevant hereto, CFL was not licensed as a roofing contractor or a building contractor or a Construction Business Information.

14. At all times relevant hereto, CFL was conducting business in Broward County, Florida.

15. At all times relevant hereto, CFL does business under the name "MB Home Improvements."

16. At all times relevant hereto, CFL was acting as an authorized agent for MB.

**Defendant Roi Neeman:**

17. Defendant ROI NEEMAN ("NEEMAN"), is an individual who is a resident of Broward County, Florida, and is *sui juris.*

18. At all times relevant hereto, NEEMAN was not licensed as a roofing contractor, a building contractor or a construction business information.

19. At all times relevant hereto, NEEMAN was and remains the President of CFL. In the alternative, NEEMAN does business under the name "CONSTRUCTION FORT LAUDERDALE".

20. Upon information and belief, at all times relevant hereto, NEEMAN was and remains the sole shareholder of CFL and that CFL is the alter ego for NEEMAN.

21. At all times relevant hereto, NEEMAN was acting as an authorized agent for MB.

**JURISDICTION AND VENUE**

22. This is an action for damages in excess of seventy five thousand dollars ($75,000.00), excluding interest, costs and attorneys' fees.

23. The Plaintiff is a citizen of the State of New York, and all the defendants are citizens of the State of Florida.

24. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a)(1) as there is diversity of citizenship between the Plaintiff and defendants.

25. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2) as the defendants reside in the State of Florida, County of Broward, and a substantial part of the events or omissions giving rise to the claims occurred in Broward County, Florida, and the property that is the subject of the action is situated in Broward County, Florida.

**FACTS RELEVANT TO ALL COUNTS**

**THE "ARRANGEMENT"**

26. Upon information and belief, BOHADANA, in his individual capacity and as president of MB, allowed and continues to allow, multiple third parties to use the MB name to solicit customers, enter into construction contracts with customers and provide construction services in Florida.

27. Upon information and belief, BOHADANA and MB knowingly and willingly (i) allowed NEEMAN to operate under MB's name; (ii) to trade on MB's goodwill and (iii) to act as MB's agent and representative.

28. In exchange for the use of MB's name and goodwill, NEEMAN and CFL would pay MB a portion of the proceeds collected by NEEMAN and/or NEEMAN's Company, CLF.

29. Upon information and belief, BOHADANA does not oversee each project that is contracted for by the other entities operating under MB's name.

**THE PROJECT**

30. On or about July 20, 2023, PIAFSKY entered into a contract (the "Contract of Sale") to purchase the Property.

31. Upon entering into the Contract of Sale, PIAFSKY began to search for licensed contractors who could perform major renovations to the interior and exterior of the Property.

32. Between on or about July 25, 2023 through July 30, 2023 met with NEEMAN to interview him as a potential contractor for the Property.

33. NEEMAN represented that he was a licensed contractor, MB was "his" company, and that he had authority to enter into contract on behalf of MB. Indeed, at least one time, NEEMAN informed PIAFSKY that she could make one of the payments to NEEMAN's personal bank account.

34. Between July 25, 2023 and July 30, 2023, NEEMAN, acting as MB's agent, tendered a bid and certain revised bids to PIAFSKY for renovations to the Property.

35. Upon information and belief, BOHADANA did not review the bids prior to its communication to PIAFSKY, but rather had entrusted NEEMAN's judgment and allowed him to make bids for construction projects.

36. On or about August 2, 2023, PIAFSKY accepted a revised bid, which became the contract between MB and PIAFSKY. A copy of the contract that NEEMAN has confirmed was the operative contract is annexed hereto as **Exhibit A**

37. The bid and contract identified the Contractor as "MB HOME IMPROVEMENTS, INC. and has license numbers CBC1265305 and CCC1334811". The bid/contract also states that

"All warranty, service calls and claims related to the project will be thru Construction Fort Lauderdale DBA MB Home Improvements."

38. MB, via NEEMAN and CFL, has acknowledged and affirmed the existence of the contract and the Project.

39. With the exception of the two payments, payments were made to CFL bank account, with the understanding that such payments were being made and/or forwarded to MB. Two of the payments were made directly to NEEMAN's personal account with the understanding that such payments were being forwarded to MB.

40. At the time MB and PIAFSKY entered into the contract, and as part of the contract, PIAFSKY expressed, and MB accepted, that it was a material condition of the contract that the interior renovations be completed by February 19, 2024 and that the exterior renovations be completed by no later than April 20, 2024.

41. Subsequently, NEEMAN represented that the interior renovations would be completed by January 1, 2024, and then changed the date to January 7, 2024.

42. On or about October 10, 2023, PIAFSKY completed her purchase of the Property.

43. On or about October 11, 2023, MB began construction and demolition work at and on the Property.

44. Upon information and belief, BOHADANA did not visit the Property at any time, and instead trusted NEEMAN to perform the demolition and construction work in an appropriate and workmanlike manner.

45. All the actual work performed at the Property was performed by and/or under NEEMAN's supervision, both individually and/or through his company, CFL.

46. Neither NEEMAN nor CFL had a licensed building contractor at the Property to oversee the work that MB, NEEMAN and CFL were performing at the Property.

47. From October 11, 2023 through and until January 1, 2024, MB, working through NEEMAN and CFL, performed intermittent work on the Property.

48. At various intervals, PIAFSKY would check on the state of the renovations. On each occasion, PIAFSKY expressed her dissatisfaction to NEEMAN that the renovations were not proceeding according to schedule.

49. On more than one occasion, NEEMAN informed PIAFSKY that certain work had been completed. PIAFSKY would then travel from New York to Florida to inspect the completed work, only to discover that the work was not done.

50. Notwithstanding MB's failure to work on the Property, MB, acting through NEEMAN, would demand additional payments from PIAFSKY. NEEMAN, acting as MB's agent would threaten PIAFSKY that what little work was being performed would stop if PIAFSKY did not pay the additional funds.

51. MB, acting through NEEMAN demanded that PIAFSKY pay the kitchen cabinet materialman/subcontractor directly for the cabinets and installation (even though such services were included in the initial contract). PIAFSKY complied with MB's demand and paid the kitchen cabinet materialman/subcontractor directly, and the contract price was lowered to reflect the change. A copy of Invoice/Work Order No. 96 dated Nov. 20 2023 reflecting the aforementioned change is annexed hereto as **Exhibit B**.

52. In late December 2023, MB, acting through NEEMAN, demanded that PIAFSKY pay to MB additional funds, otherwise NEEMAN would stop all work on the Property. PIAFSKY responded that MB had fallen well behind in schedule and that barely any work had been done.

53. Finally, on or about January 2, 2024, PIAFSKY terminated MB from the project due to, *inter alia*, MB's failure to perform the demolition and construction in a workman like manner, its failure to perform the project expeditiously, and its repeated threats to cease all work unless additional monies were paid by PIAFSKY.

**<u>THE TRUTH IS EXPOSED:</u>**

54. After terminating MB from the project, certain inconsistencies were discovered by PIAFSKY. While NEEMAN always represented that he owned MB and it was "his" company, it came to light that MB was operated (and, upon information and belief, owned) by BOHADANA.

55. PIAFSKY had never met, or heard of, BOHADANA at any time prior to MB's termination.

56. Subsequently, PIAFSKY had multiple contractors visit the Property to obtain new estimates for the interior and exterior renovations. Based upon the observations of the licensed contractors, it became clear that MB had not performed any significant portion of work required under the contract, and that for that small portion of work that was done, it was done improperly and/or not compliant with Florida's building code. For example, and by no means exclusive:

a. MB had advised PIAFSKY that she needed to tear out all the existing dry wall, however, after MB's termination, other contractors informed PIAFSKY that a "skim coat" could have been applied to the existing dry wall which would have lowered the project price considerably;

b. MB had hired an engineer to draw plans for the project, however the engineer's plans failed to provide the proper dimensions for the interior of the Property, sometimes mislabeling the length/height of certain areas by over a foot;

c. The cement in the kitchen floor was sealed without installing the electrical wiring first;

d. The walls in the kitchen were closed up by MB without first blocking where the kitchen cabinets were to be mounted;

e. MB closed up walls without placing the outlets in the correct spaces that had been previously marked by PIAFSKY;

f. MB used flex piping for the hot water lines, which piping is known to be prone to degradation and leakage after seven years;

g. MB used unlicensed electricians and unlicensed plumbers for work at the Property;

h. The drain in the master bathroom's shower was installed in the wrong area preventing proper drainage;

i. MB failed to properly grade the floor of the master bathroom's shower so that the water would be funneled to the drain;

j. MB failed to install the electrical wiring through the proper channels provided for wiring and instead left the wires exposed against the sheetrock;

k. MB failed to stagger the sheetrock properly contrary to Florida's Building code;

l. MB installed gypsum sheetrock in the bathroom in areas on walls that were to be tiled – durock should have been used as sheetrock would be unable to support the tiles;

m. MB failed to install proper framing for the interior doors. The framing that was installed by MB was not tall enough to support the doors properly and would lead to shaky and unsteady doors;

n. MB failed to install linear air vents as required by the contract and instead used square vents contrary to PIAFSKY's instructions;

o. MB failed to perform the majority of the work required under the contract;

p. MB moved the blower portion of the air conditioner unit from the first floor to the attic. In moving the air conditioner blower, MB intentionally damaged the trusses supporting the roof of the Property, thus weakening the roof. Furthermore, moving the air conditioner blower to the attic would cause the air conditioner to malfunction in the summer due to the heat, and increase the likelihood of condensation leaks that would result in more damage;

57. Additionally, during the demolition of the interior walls, MB threw the rubbish into Plaintiff's swimming pool causing damage to the pool's "Diamond Bright™" surface coating as well as to the pool's mechanical pumps.

58. During construction, MB, working through NEEMAN, ordered certain new fixtures, and held them in a storage space that was leased to a third party. Upon information and belief, the storage space was leased by a company owned by NEEMAN's wife's parents. PIAFSKY was unaware that MB was using a third party's storage space for the storage of PIAFSKY's property.

59. During construction, MB, working through NEEMAN, removed fixtures from the Property and stored them in in the same storage space which was leased by a third party.

60. After MB was terminated from the Project, MB refused to return PIAFSKY's property that it was holding in storage. Within a short time after MB's termination, it was discovered that the tenant for the storage space was being evicted, and thus PIAFSKY's property had to be removed immediately lest PIAFSKY be locked out of the storage space and deprived

of access to her property. Due to MB and NEEMAN's actions, PIAFSKY was caused to incur a fee in order to retrieve her fixtures from the storage space and deliver the same to the Property.

61. Upon PIAFSKY's inspection of the property that was held by MB in storage, it became evident that certain items were damaged and/or broken, and that the time to exchange such items had expired. MB had either accepted broken items without examining the same, and allowed the warranty on the item to lapse, or the items were broken while being stored by MB.

62. Notwithstanding the foregoing, prior to terminating MB, PIAFSKY paid to MB approximately $193,680.00, plus an additional $6,100.00 for the engineer used by MB and NEEMAN for a total of $199,780.00, representing 88% of total amount listed in the contract as amended.

63. Additionally, PIAFSKY was forced to pay an additional deposit of $22,000.00 to the kitchen cabinet materialman/subcontractor for work and material that was originally to be provided and performed by MB. PIAFSKY will have to pay an additional $25,000.00 in costs and fees to the kitchen cabinet materialman/subcontractor for the completed cabinets and installation of the same.

64. Although PIAFSKY had paid to MB approximately eighty eight (88%) percent of the contract price, less than ten (10%) percent of the interior work was completed, the work that was done was defective, and none of the exterior work was performed.

65. PIAFSKY was forced to hire a new contractor, not only to complete the renovations to the Property, but also to repair the defective and inferior work performed by MB.

66. As the work at the Property is ongoing, it is anticipated that additional issues with the work that was performed by MB through NEEMAN and CFL will be revealed.

67. All conditions precedent to the filing of this action have occurred, are deemed waived, excused or otherwise satisfied.

68. Plaintiff has retained the undersigned counsel to represent her in the prosecution of this action, and is obligated to pay such attorneys their reasonable fees and expenses.

**COUNT I – Breach of Contract**
(Against Defendant MB)

69. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

70. Plaintiff entered into the contract with Defendant MB pursuant to which MB was to provide contracting services and complete certain improvements to Plaintiff's Property.

71. Pursuant to the contract, Plaintiff was required to make timely payments on Defendants' invoices for work completed.

72. Plaintiff fully performed its contract obligations.

73. Pursuant to the contract, MB was to acquire all materials and permits required, and complete all the work in a timely fashion.

74. MB failed to perform its contract obligations.

75. MB did not obtain all required permits.

76. MB did not obtain all required materials.

77. MB did not perform the work in professional, workman like manner.

78. MB did not complete the renovations that it was to perform under the contract.

79. As a direct and proximate result of MB's breach of contract, Plaintiff has suffered substantial losses and damages.

80. The damages suffered by Plaintiff include, but are not limited to, costs incurred to hire a new contractor, damages done to the Property, as well as expenses incurred as a result of delays in the renovations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against MB for damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT II – Breach of Contract**
(Against Defendants NEEMAN and CFL)

81. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

82. Pursuant to the contract, "All warranty, service calls and claims" regarding the project were to be performed by "Construction Fort Lauderdale".

83. All the work that was done at the Property, was done either by NEEMAN directly, or under NEEMAN's supervision.

84. Neither NEEMAN nor CFL are licensed by the State of Florida as a contractor and neither NEEMAN nor CFL are licensed by the State of Florida to insure the Project.

85. NEEMAN and CFL, through NEEMAN, have made it clear that it will not return the monies paid by PIAFSKY, and it will not pay for PIAFSKY's new contractor.

86. As a result, NEEMAN and CFL are unable and unwilling to warranty the defective work done on the Property and cannot warranty the work that was not performed.

87. As a direct and proximate result of NEEMAN and CFL's breach of contract, Plaintiff has suffered substantial losses and damages.

88. The damages suffered by Plaintiff include, but are not limited to, costs incurred to hire a new contractor, damages done to the Property, as well as expenses incurred as a result of delays in the renovations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against NEEMAN and CFL, jointly and severally, for damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT III – Fraud**
(Against Defendant NEEMAN)

89. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

90. As set out more fully above, NEEMAN made false and misleading statements regarding the progress of the contract work and expected completion dates in order to induce Plaintiff to continue making contract payments to MB.

91. NEEMAN deliberately failed to disclose to Plaintiff the material facts necessary to make the misleading representations truthful.

92. NEEMAN had knowledge of, or should have known of, these material facts and knowingly concealed this material information with the intent to induce Plaintiff to continue making contract payments to MB.

93. As a direct and proximate result of NEEMAN's tortious conduct, Plaintiff has suffered substantial losses and damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against NEEMAN for damages, in an amount to be determined at trial, but in any case, no less than

$200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT IV – Fraud**
(Against Defendants MB and BOHADANA)

94. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in paragraphs 1 through 68 above.

95. As set out more fully above, BOHADANA and MB knew and allowed NEEMAN and CFL to operate under MB's name and reputation without oversight by BOHADANA.

96. BOHADANA and MB knew and allowed NEEMAN to submit bids for contracting work for MB's name and reputation without oversight by BOHADANA.

97. BOHADANA and MB owed PIAFSKY a duty of care to oversee the work done by NEEMAN and CFL and to prevent the false and misleading statements made to PIAFSKY regarding NEEMAN's position with and ownership of MB, his licensure and/or lack thereof as a contractor, and his ability to perform the work required under the contract.

98. BOHADANA and MB had knowledge of, or should have known of, these material facts and knowingly concealed this material information.

99. As a direct and proximate result of BOHADANA and MB's tortious conduct, Plaintiff has suffered substantial losses and damages.

100. WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants BOHADANA and MB for damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT V – Negligence**
(Against All Defendants)

101. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

102. Each defendant in the instant action owed PIAFSKY a legal duty to comply with the Florida Building Code (and Florida Statutes incorporating the Florida Building Code) as each Defendant was involved in the facilitation of the Project from licensure to building permit to the actual servicing of the Project.

103. Each Defendant breached the duty of care owed to PIAFSKY because the work that was done did not comply with the Florida Building Code.

104. Plaintiff has been injured because each Defendants' breach of the duty of care owed to Plaintiff prevented Plaintiff's use and enjoyment of the Property and has created safety issues, and has left the Plaintiff with no alternative but to have an independent licensed contractor review and correct most, if not all, of the work that was done by Defendants.

105. Plaintiff has also been damaged economically by each Defendants' breach of the duty of care owed to Plaintiff, including but not limited to, the expenditure of significant sums of money to correct the inferior and defective work performed by Defendants.

106. Plaintiff's injuries have been proximately caused by the negligence of each Defendant, and the damages remain accruing.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against each Defendant for damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT VI – UNJUST ENRICHMENT**
(Against MB, NEEMAN and CFL)

107. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

108. Although PIAFSKY has paid approximately 80% of the contract price, MB did not approach anywhere near 80% of completion of the contractual obligations. Moreover, the work that MB did perform was defective.

109. Upon information and belief, the payments made to NEEMAN and CLF were shared with MB and NEEMAN.

110. As a result, MB, NEEMAN and CFL have accepted payment from PIAFSKY in the amount of $199,780.00.

111. MB, NEEMAN and CFL have been unjustly enriched in the amount of $199,780.00 while PIAFSKY was left with an unusable house, and was forced to hire a new contractor to correct the defective work that was performed by MB, NEEMAN and CFL, and to perform the work that was not performed by MB, NEEMAN and CFL.

112. It would be inequitable for MB, NEEMAN and CFL to retain the benefit of the monies paid by PIAFSKY when PIAFSKY did not receive the work and services for which she paid.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants MB, NEEMAN and CFL for damages, in an amount to be determined at trial, but in any case, no less than $199,780.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT VII – NEGLIGENCE PER SE**
(Against MB and BOHADANA)

113. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

114. Defendants MB and BOHADANA owed PIAFSKY, and the public at large, a duty not to participate in the unlicensed practice of construction services, to prevent the use of BOHADANA and MB's license by unlicensed parties to solicit contracts, to submit bids, and to prevent unlicensed construction work.

115. MB and BOHADANA intentionally and knowingly allowed NEEMAN and CFL to operate under MB's name and to use MB and BOHADANA's licenses to perform unlicensed construction services.

116. Additionally, MB and BOHADANA allowed NEEMAN and CFL to perform residential construction work under MB and BOHADANA's certification, without MB and/or BOHADANA having any active participation in the operations, management, control or oversight of the project.

117. Had MB and BOHADANA prohibited NEEMAN and CFL from conducting business under MB's certification, NEEMAN and CFL would not have been able to conduct the negligent acts which damaged Plaintiff's property.

118. As a result of the foregoing, Plaintiff has been damaged, as the work actually performed by MB on the Property, via NEEMAN and CFL, was defective, while the majority of the work was not performed at all.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants MB and BOHADANA for damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees

and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT VIII – NEGLIGENCE PER SE**
(Against CFL and NEEMAN)

119. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

120. Defendants NEEMAN and CFL owed PIAFSKY, and the public at large, a duty not to participate in the unlicensed practice of construction services.

121. NEEMAN and CFL intentionally and knowingly allowed operated under MB's name and license to perform construction services without proper management and supervision by a licensed person.

122. As a result of the foregoing, Plaintiff has been damaged, as the overwhelming majority of work was not performed, and the work that was actually performed on the Property, by NEEMAN and CFL, was defective.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants NEEMAN and CFL for damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT IX - VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Against MB and BOHADANA)**

123. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

124. Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits unfair and deceptive acts or practices in the conduct of any trade or commerce. §501.204(1) Fla. Stat.

125. MB and BOHADANA have violated FDUTPA by knowingly allowing NEEMAN and CFL to enter into contracts on behalf of MB, and engage in construction work under MB's name and certification, but without supervision by MB or BOHADANA.

126. As a result thereof, PIAFSKY has been damaged by MB and BOHADANA's unfair and deceptive acts and practices.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants MB and BOHADANA for damages, in an amount to be determined at trial but in any case no less than $200,000.00 and awarding Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT X - VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Against NEEMAN and CFL)**

127. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

128. Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits unfair and deceptive acts or practices in the conduct of any trade or commerce. §501.204(1) Fla. Stat.

129. NEEMAN violated FDUTPA by knowingly and intentionally representing that he owned MB and that he was licensed as a general contractor, and by engaging in construction work under MB's name and certification without MB or BOHADANA's supervision.

130. CFL perpetuated this deceptive practice by doing business under the name "MB Home Improvements" and by offering services such as "warranty, services calls and claims" that it was not qualified to offer.

131. As a result of the foregoing, PIAFSKY has been damaged by NEEMAN and CFL's unfair and deceptive acts and practices.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants NEEMAN and CFL for damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT XI - FRAUD IN THE INDUCEMENT**
**(Against NEEMAN and CFL)**

132. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

133. As set out more fully above, NEEMAN made false and misleading statements to PIAFSKY regarding his position with and ownership of MB, his licensure and/or lack thereof as a contractor, the certification of the subcontractors who would be involved in the Project, and his ability to perform the work required under the contract, in order to induce Plaintiff to enter into the contract.

134. NEEMAN knew, or should have known, that he made these false statements to induce PIAFSKY to enter into the contract, and to make payments under the contract.

135. As a result of the foregoing, PIAFSKY has been damaged by NEEMAN's fraudulent inducement and PIAFSKY must now hire new contractors to correct the defective

work that was done by MB via NEEMAN and CFL, and to perform the work that was not performed at all.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants MB and BOHADANA for damages, in an amount to be determined at trial but, in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, treble damages, pre-and post-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNT XII - STATUTORY DAMAGES**
**(Against All Defendants)**

136. Plaintiff adopts, realleges, and incorporates herein each and every allegation contained in Paragraphs 1 through 68 above.

137. MB and BOHADANA allowed unlicensed contractors, *to wit*, NEEMAN and CFL to submit bids, enter into contracts and engage in construction work on behalf of MB, without supervision by MB and BOHADANA.

138. NEEMAN and CFL submitted bids, entered into contracts and engaged in construction work on behalf of MB, without supervision by MB and BOHADANA.

139. The work performed by NEEMAN and CFL was defective.

140. Pursuant to §768.0425 Fla. Stat. when bringing an action against a contractor for negligence, malfeasance and/or misfeasance, the injured party is entitled to treble damages if the contractor is not certified as a contractor.

141. In the instant matter, although BOHADANA and MB were licensed by the State of Florida, the actual work was performed by NEEMAN and CFL, who are not licensed by the State of Florida.

142. Because of these deficiencies, the Defendants may be held liable for treble damages in addition to costs and attorneys' fees.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants for treble damages, in an amount to be determined at trial, but in any case, no less than $200,000.00 and award Plaintiff costs incurred in this action, attorneys' fees and costs, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all triable issues.

Dated: December 12, 2024

Respectfully submitted,

**BERENTHAL & ASSOCIATES, P.A.**

By: __________________________
David W. Berenthal
Florida Bar No. 159220
E-mail: dwb@berenthalaw.com
255 Alhambra Circle, Suite 1150
Coral Gables, FL 33134
Telephone: (212) 302-9494

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:24-cv-60382-DSL

JESSICA PIAFSKY, an individual,

Plaintiff,

v.

MB HOME IMPROVEMENTS INC. a Florida Corporation, MAXIM BOHADANA, an Individual, ROI NEEMAN, an Individual and CONSTRUCTION FORT LAUDERDALE, INC. d/b/a MB HOME IMPROVEMENTS, a Florida Corporation,

Defendants

**FIRST AMENDED COMPLAINT**

# EXHIBIT A

# INVOICE / WORK ORDER

HOME MB IMPROVEMENTS

MB Home Improvements
4814 SW 34th Terrace
Fort Lauderdale, FL 33312, USA
(954) 609-8006
Constructionfortlauderdale@gmail.com

| | |
|---|---|
| Invoice # | 69 |
| Date | Sun Jul 30 2023 |
| Balance | **296275.00** |
| Due On | Sun Jul 30 2023 |

**Bill To:**
Sam Farber
3727 SW 51st St
Fort Lauderdale, Florida 33312
(917) 282-9500
Jessicapiafsky@gmai.com

**Service Location:**

| Description | QTY | Price | Amount |
|---|---|---|---|
| **Demolition**<br>Demo of all necessary areas throughout the house.<br>Including but not limited to windows, wall entrance, flooring, bathroom demos...<br>Trash removal. | 1.00 | 8000.00 | 8000.00 |
| **Hurricane Proof Windows**<br>Hurricane impact windows & sliding doors.<br>Total of 25 windows including single hung, horizontal rolling and fixed windows.<br>*1 sliding door (3 panels)*<br>*Hurricane impact front exterior door.*<br>*2 doors* | 1.00 | 48000.00 | 48000.00 |
| **Hurricane Proof Windows**<br>Remove double windows and create section for single window throughout the house where there is double windows. This includes anything extra for windows & labor | 1.00 | 8500.00 | 8500.00 |
| **Labor & Material**<br>Remove all current drywall with knockdown texture and replace with new to create a smooth wall and ceiling finish.,<br>Paint finish. This includes Eggshell walls in non-wet rooms & bathroom paint in bathrooms. This includes color paint. | 1.00 | 16500.00 | 16500.00 |
| **Labor & Material**<br>Remove wall on right side in the entrance area. | 1.00 | 0.00 | 0.00 |

| Description | QTY | Price | Amount |
|---|---|---|---|
| **Labor & Material**<br>Close opening for door for children's bedroom and move to the over side next to the bathroom. Build a closet or shelving area (remove built in desk and shelving.) | 1.00 | 600.00 | 600.00 |
| **Labor & Material**<br>Remove half wall in the kitchen. | 1.00 | 0.00 | 0.00 |
| **Kitchen Remodel**<br>Build kitchen against the wall on the right side of the house. Remove current and create a new island. Install all new appliances.<br>Kitchen remodel will include:<br>New kitchen cabinets<br>New countertops up to $1400 per slab including 5 slabs.<br>MB Home Improvements is not responsible for finished goods for kitchen remodel. That is including sink, faucet, appliances etc... This is for a 19x12 kitchen | 1.00 | 43500.00 | 43500.00 |
| **Labor & Material**<br>Remove and replace baseboards throughout the house. | 1.00 | 4500.00 | 4500.00 |
| **Labor & Material**<br>Remove and replace crown molding throughout the house. *OPTIONAL | 1.00 | 2000.00 | 2000.00 |
| **Electric Work**<br>Change lighting to LED recess lights 3" or 4" throughout the house. (40pc) - Please check this number - seems like too little.<br>Replace all the light features and fans (customer will supply)<br>Change all the electric switches, alarm contacts and controls, electrical outlets and vents etc... → linear modern vents, screwless plates<br>Remove and install new light feature in front of the house (customer will supply)<br>Upgrade electric panel.<br>Change to tankless water heater.<br>Solar backup generator.<br>→ * This includes waterproof grade ones in bathroom | 1.00 | 16000.00 | 16000.00 |

| Description | QTY | Price | Amount |
|---|---|---|---|
| **Exterior Work**<br>Remove window shutter controls.<br>Outdoor kitchen with cover (customer will supply appliances). For 15 linear feet<br>Remove and install all the outdoor lighting and add more where is needed.<br>Run electricity outside for kitchen and pergola (customer will supply pergola).<br>Redo fencing.<br>Camera security system. (Will try to use current wires.)<br>Wiring for outdoor speakers.<br>Tile the entire outside area.<br>Pool heater with in ground hot tub.<br>Removal of shutters and rail once windows are installed.<br>Paint complete exterior house. | 1.00 | 68000.00 | 68000.00 |
| **Carpenter work**<br>All built in closets throughout the house.<br>Including 3 closets in 3 bedrooms.<br>2 closet in master bedroom.<br>Laundry area.<br>~~Front closet.~~ no front closet<br>*includes upgraded finish on Master closet | 1.00 | 12000.00 | 12000.00 |
| **Flooring**<br>Remove and replace flooring throughout the entire house.<br>Laminate in the 3 existing kids bedrooms and the two new bedrooms in the garage<br>Finished material is not included. Only labor and rough materials. | 1.00 | 19375.00 | 19375.00 |
| **Bathroom Remodel**<br>Master bathroom remodel.<br>Tile on walls and floors. (Customer will provide tile). (-1000$ if paint) TBD<br>Move toilet to the left where the bidet piping is.<br>Enlarge shower with glass doors.<br>Replace vanity and sink (customer will provide).<br>Replace bathtub with free standing tub (customer will provide tub). | 1.00 | 14600.00 | 14600.00 |
| **Master bedroom**<br>Relocate entrance.<br>(Move the door to the closet to the bedroom.) | 1.00 | 0.00 | 0.00 |
| **Bathroom Remodel**<br>Change half bathroom to full bathroom by adding shower.<br>Tile on walls and floors. (Customer will provide tiles)<br>Replace vanity, toilet, sink & faucet, mirror & showerhead (customer will provide)<br>includes 60" vanity located to left side wall and door moved to center of room from left.<br>(-1000 if all paint except shower TBD) | 1.00 | 12300.00 | 12300.00 |

| Description | QTY | Price | Amount |
|---|---|---|---|
| **Bathroom Remodel**<br>Full bathroom remodel<br>Replace double vanity with sinks. (Customer will provide)<br>Change light features.<br>Change bathtub and add shower door. (Customer will provide bathtub)<br>~~Change cabinet.~~ no cabinet<br>New tile on walls and floors. (Customer will provide tile)<br>(-1000 if don't tile walls - TBD) | 1.00 | 9800.00 | 9800.00 |
| **Labor & Material**<br>Relocate laundry to the garage and add shelving and counter.<br>inclused closed cabinet rather than shelves) | 1.00 | 0.00 | 0.00 |
| **Labor & Material**<br>Install water filtration system.<br>full house | 1.00 | 400.00 | 400.00 |
| **Labor & Material**<br>Garage conversion<br>Convert garage into to bedrooms with one window in each room.<br>Laundry room will be in garage as well as a storage area will be created.<br>* includes floor, walls, lights, mini split & baseboard | 1.00 | 12200.00 | 12200.00 |
| **Permit**<br>Permit fee is a separate charge that can be paid directly to the city. Fees are determined by type of work and every city has different fees.<br>Work may be changed due to city requirements. Those prices are not included and any extra work will be an extra charge.<br>estimated 2% of filing | 1.00 | 0.00 | 0.00 |
| **General Warranty**<br>All warranty, service calls and claims related to the project will be thru Construction Fort Lauderdale DBA MB Home Improvements. | 1.00 | 0.00 | 0.00 |
| **Covid 19**<br>All estimates are based on manufacturer time frame. In case of any delays you are aware and agree to any delays that may be caused by the manufacturer. | 1.00 | 0.00 | 0.00 |
| **Engineering**<br>Engineering fee is determined by the engineer for plans to submit to the city.<br>estimated $5,500 | 1.00 | 0.00 | 0.00 |

| Description | QTY | Price | Amount |
|---|---|---|---|
| | 1.00 | 0.00 | 0.00 |

**Payment terms**
$20,000 DEPOSIT PART 1, AT SIGNATURE
$67.882.50 DEPOSIT PART 2 (TOTAL 30%) 8/16/2023 Est 10/10
$9,169.50 BEGIN DATE – Demo starts – unless work is completely stopped for some reason
$9,169.50 WEEKLY PAY FOR 19 WEEKS (5MONTHS) –
$25,000 WHEN JOB IS COMPLETE
CASH, CHECK, ZELLE (9546098006),CREDIT CARD ADD 4%,
SUNBIT ADD 6%

| | |
|---|---|
| Sub total | 296275.00 |
| Tax | 0.00 |
| Tax Rate | 0.000% |
| Total | 296275.00 |
| Balance | 296275.00 |

## TERMS AND CONDITIONS

Contractor and Owner, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged, hereby agree as follows on the date set forth below:

CONTRACT DOCUMENTS: Contractor is MB HOME IMPROVEMENTS, INC. and has license numbers CBC1265305 and CCC1334811. The Contract Documents consist of this Contract and the documents set forth above and those documents referenced including the Florida Construction Disclosures and the Right of Rescission. The Contract Documents also include any modifications of this Contract subsequent to its execution. These documents form the Contract and are as fully a part of the Contract as if attached to this Contract. The Contract represents the entire agreement between the parties and supersedes prior negotiations, representations or agreements, either written or oral. If anything in the other Contract Documents is inconsistent with this Contract, this Contract shall govern. The Contractor shall be furnished, free of charge, such copies of any and all drawings, plans, and specifications as are reasonably necessary for execution of the Work.

WORK: The term "Work" means the materials and services expressly set forth in the Contract Documents. The Work may constitute the whole or a part of the Project. The scope of Work may be increased, decreased, changed or modified by agreement of the parties. All listed limitations and exclusions are specifically excluded from this Contract, the Work and the Contract Price. All allowances are an estimate and costs and fees in excess of an allowance item shall be billed and paid as a Change Order.

CONTRACT PRICE: Subject to exclusions and allowances, Change Orders, claims and other additions and deductions as set forth herein, Owner shall pay to Contractor the Contract Price. A punch list or warranty items or issues do not constitute a basis for withholding payment to the Contractor. All payment shall be made in good U.S. funds. Unpaid amounts shall bear interest from the date payment is due at 1.5% per month.

PROGRESS PAYMENTS: Owner shall pay to Contractor any deposit no later than (5) days of the last party executing this Agreement. Payment shall be made to Contractor as otherwise set forth in this agreement or within seven (7) days after receiving an invoice or payment application, whichever is earlier. Time is of the essence with respect to all progress payments by Owner. Time is of the essence in Regard to Contractor.

FINAL PAYMENT: A final payment, consisting of the unpaid balance of the Contract Price shall be made as set forth in this agreement or within seven (7) days after substantial completion of the Work by Contractor, whichever is earlier. Time is of the essence with respect to final payment by Owner.

OWNER REPRESENTATIVE: If multiple Owners sign this agreement, any Owner has full authority to direct the Contractor to do extra work or make changes to the scope of Work. Any and all instructions (written or oral), acts, or omissions of the any Owner shall bind the Owner as if made by all Owners.

COOPERATION WITH LENDER: Owner shall cooperate with any lending entity or entities providing financing for the Project and shall supply such information and certifications as may reasonably be required, from time to time, in order that Owner can satisfy conditions for lender to make payments to Contractor. Owner shall not hinder or delay the approval of the work to delay or prevent payment to Contractor.

ACCEPTANCE: Owner shall ~~immediately~~ inspect the Work when it has been comp[...] to the Owner must be specifically noticed in writing to the Contractor ~~within five calendar days following~~ completion of that aspect of the Work or the Work whole. Owner's failure to provide written notice to Contractor of any issues, claims or defects within 14 days of Owner's beneficial use of the Project and Work, or the issuance of a certificate of completion or certificate of occupancy, whichever is sooner. The contractor shall be given a reasonable opportunity to address the issue (as set forth herein and pursuant to Florida law). Every 6 weeks

TIME: Contractor shall achieve substantial completion and final completion of the entire Work in a reasonable amount of time subject to the conditions and circumstances surrounding the Work and Project. The Owner shall make the Project available and take all steps necessary to allow the Contractor to perform the Work on the Project not less than fifty hours per week, Monday through Saturday, 7AM to 5PM. Any and all substantial completion and final completion dates provided are merely estimates. Can work Sunday too.

CHANGE ORDERS: Owner and Contractor may agree to changes, additions, or deletions in the scope of work without invalidating this Contract ("Change Order"). Contractor and Owner shall agree on said change order work and costs in writing and Contractor shall thereupon perform the changed Work in accordance with the terms of this Contract, Contract Documents and the Change Order. The contractor shall not be obligated to perform any changed work prior to mutual agreement of the parties. However, Contractor may rely on an Owner's oral directive to perform changed work and the Owner remains obligated to pay for same.

The Owner shall reimburse Contractor for all costs and fees incurred in connection with permits, permit processing, permit expediting, testing, inspections, fines, and code violation payments related to the Work and said costs shall be in excess of the contract price. ~~In the event of increases in the cost of materials to the Contractor after the date of this Contract, the Contractor shall pass on such increases as extra costs which the Owner agrees to pay as an additive change.~~ If material or equipment, which the Contractor is required to furnish under this Contract, become unavailable, either temporarily or permanently, subsequent to the execution of the Contract, through causes beyond its direct control, then in the case of temporary unavailability, the contract time shall be extended for such period of time as the Contractor shall be delayed by such unavailability; and in the case of permanent unavailability, the Contractor shall be excused from the requirement of furnishing such materials or equipment. ~~The Owner agrees to pay the Contractor any increase in cost between the cost of the material or equipment or furnishing (as~~ an additive change) which has become permanently unavailable and the cost of the closest substitute which is then reasonably available.

| | | |
|---|---|---|
| Owner/Agent | X [signature] | Date: 08/02/23 |
| Owner/Agent | X | Date: |
| Contractor/Agent | X | Date: |

* contractor will make home usable from Dec 14 – Jan 3 2023/4 and from feb 15-26 2024.

Contractor's sole obligation is to perform the Work actually depicted and described in the Contract Documents and/or plans and specifications or the Work directed by Owner. The Contractor is not responsible for missing or conflicting information or components from the Contract Documents, plans and/or specifications or for the constructability, performance, or use of the Contract Documents, plans, specifications, or the Project. The Contractor has not and shall not interpret the Contract Documents, plans, specifications, or Project design in order to fill in missing information or confirm compliance with the applicable building code, life safety systems, or the Americans with Disabilities Act (ADA) which the Owner agrees are its obligations.

DEFAULT: Unless permitted by Florida law, this Contract is not cancelable by Owner. If Owner (or those under its direct or indirect control) through active or passive acts, omissions, or negligence prevents, slows, or delays, the Contractor's progress of the Work (for any reason whatsoever) or causes Work to be done out of sequence, or if the Owner fails to make timely payment to the Contractor, the Owner shall be in default of this Contract. Upon default of this Contract by Owner, Contractor shall have no further obligations under this Contract and the Owner shall immediately pay to the Contractor the portion of the Contract Price due and outstanding at the time of default plus Contractor's lost profit on the uncompleted portion of the Work. Contractor may cancel this Contract at any time and for no reason, subject to returning to Owner the unused portion of any payments made.

DISPUTES: If a dispute should arise between Owner and Contractor under or relating to the Work or the Contract, or the breach thereof, then either party may seek redress of its grievances as to such disputes at law or in equity in a court of competent urisdiction located in Broward County, Florida. This Contract shall be governed and construed under the laws of the State of Florida. Each of the parties hereto consents to the jurisdiction and the venue of any such action in Broward County for all urposes in connection with this Contract. THE CONTRACTOR AND OWNER WAIVE THEIR RIGHT TO A JURY TRIAL IN ANY AND ALL CTIONS AND PROCEEDINGS. The prevailing party in any such suit or defense shall be entitled to recover from the other party ny and all costs and expenses, including but not limited to reasonable attorney's fees and costs, incurred in having to enforce s rights hereunder, with or without suit.

TE CONDITIONS: The Contractor employees shall not be required to Work in hazardous conditions and the Owner agrees to itigate such conditions prior to commencement of the Work. Contractor is not responsible or liable for vandalism, theft, or mage to the Work or surrounding areas no matter how caused, including, without limitation, wind, rain, hail, hurricanes, or s of God or third parties. The Contractor is not responsible for and shall be entitled to an additive Change Order for any and

all non-vi[illegible] or any and all unforeseen site conditions, be they underground, under-floor, behind-wall, under roof, above ceiling, or the like; and all other site conditions that are not disclosed to Contractor in writing prior to construction. The contractor is not responsible for reinstalling any alarm system it may have removed. The owner shall, at its expense, contact their alarm company to reinstall same. Owner shall secure and safeguard all personal property, jewelry, valuables, and pets during work hours. The contractor is not responsible for damage or theft to personal property that was left in the work area or the well-being of pets. The contractor shall be given, at no cost, access to water, electricity and lighting, and access to the service panel. The trash receptacle used during the Project is solely for the purpose of collecting construction-related refuse and is not to be used by the Owner. Owner agrees to pay all costs arising from unforeseen issues such as unsafe or illegal conditions, rot or mold, inspector requirements, overlooked conditions, identifying and removing hazardous materials (lead paint, solvents, asbestos, etc.) before or after the Project has begun, all as a Change Order. Contractor is not responsible for warping of material, natural grain and texture in variations of wood and stone, defects in materials, equipment or appliances covered by the manufacturer, driveway cracks formed after concrete/asphalt has set or standing water, damage due to heat, sunlight or water, rust, mold, termites or wood rot, any defects arising from work done after inspection by Owner, Regarding fencing and concrete work, underground digging, damage to sprinkler systems, main water lines, AC lines, drain lines or cable/internet/phone lines.

LIMITATION OF LIABILITY AND INDEMNIFICATION: The Contractor' liability in any action related to this Contract or the Work performed hereunder, shall in no event exceed the amount of the Contract Price and such liability may be fully discharged by a reimbursement of any payments received by the Contractor under this Contract. This limitation of liability is expressly intended to apply to all types of claims, including but not limited to claims for the Contractor's own negligence.

EXCEPT AS SPECIFICALLY PROVIDED HEREIN, IF ANY, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THE CONTRACTOR WILL NOT BE RESPONSIBLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES AND ANY CLAIM AGAINST THE CONTRACTOR OR ITS AGENTS, OFFICERS, AND EMPLOYEES SHALL BE LIMITED TO THE REPLACEMENT VALUE OF ITS WORK AND ONLY IF SUCH WORK OR MATERIAL IS FOUND TO BE DEFECTIVE.

Notwithstanding anything else to the contrary, the Contractor shall have no liability or responsibility for any damages and/or delays caused by others or for damages or delays either before commencement of, or during said Work, or after said Work, caused by structural faults, temperature changes and differentials, sun and weather exposure, strikes, material shortages, labor shortages, war, Acts of God, rain, wind, wind storms, fire, floods, theft, vandalism, hurricanes or any event beyond its direct and immediate control. Contractor shall not be responsible for any damage which has or may have occurred prior to the commencement of Contractor's Work, including, without limitation, drywall, wood, furniture, fixtures, insulation, and paint. Any interruption in the Work which results in lost time and/or material and is not the sole and direct fault of the Contractor, shall be paid by the Owner as an extra cost according to time and material lost as an additive Change.

If any claim is made for damage or injury including death, the Owner agrees to indemnify and hold the Contractor harmless from and against such claim and all loss, damage, injury and expense (including reasonable attorney's fees and costs) that the Contractor may sustain when such claim is directly or indirectly based or related to the Owner's or its agents', contractors', or employees' negligent, intentional or wrongful acts or omissions.

OWNER SUPPLIED MATERIALS AND LABOR: If the Owner, before or during the course of the Work, purchases its own materials and/or supplies and/or directly retains the labor and/or services of an alternate contractor(s) and/or specialty contractor(s) (herein collectively "Owner Supplied Materials and Labor"), then Owner shall (1) be solely responsible for the timely delivery, coordination, insurance, protection, and security of and for the Owner Supplied Materials and Labor and (2) take all steps necessary to not adversely affect the Contractor's construction schedule or the sequence of the Contractor's Work. At Owner's sole cost and expense, Owner shall fully abide by and comply with all of Contractor's requests that any or all Owner Supplied Materials and Labor be furnished or held (and stored and not delivered/commenced) at the dates, times, and locations designated by Contractor at its sole and absolute discretion. The contractor shall have sole discretion to allow or refuse to allow any trade from working under its permit.

Additionally, all such labor and/or services of an alternate contractor(s) and/or specialty contractor(s) shall be performed under permits, licenses, and insurance separate and apart from the permits, license, and insurance covering the Work of the Contractor under this Agreement. The Owner hereby agrees to defend, indemnify and hold Contractor harmless from any and all costs, fees, expenses, damages, losses, impacts, and injuries (including death) caused by the Owner's alternate contractor(s) and/or specialty contractor(s) for any reason whatsoever. Notwithstanding the foregoing, the Owner shall, within five calendar days of retaining said alternate contractor(s) and/or specialty contractor(s), take all steps necessary to cause said alternate contractor(s) and/or specialty contractor(s) to furnish to Contractor valid, effective, and enforceable certificates of insurance naming Contractor as an additional insured on said alternate contractor(s) and/or specialty contractor(s) policy. Said certificate and policy shall specifically prohibit said alternate contractor(s) and/or specialty contractor(s) from amending or canceling said policy without 30 days prior written notice to Contractor and shall be issued in amounts no less than $1,000,000 by an A+ or better AM Best rated company licensed in Florida. Contractor, at its sole and absolute discretion, may slow or stop all Work until such time as said insurance certificates are provided. The Owner shall be responsible for any and all incurred demobilization and/or remobilization costs, fees, and/or impacts suffered by Contractor as an additive Change Order.

SUBCONTRACTS: Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The contractor has the absolute and sole discretion to select and hire the subcontractors and suppliers of its choice. Owner shall not interfere with or direct the work of said subcontractors.

MATCHING: Contractor will use reasonable efforts to match the color, finish, hue, texture, size, shape, dimension, make, model and the look and feel of materials, but there will be differences and said differences shall not be a basis to reject Work or refuse

to make payment. Owner is given notice now that a full replacement is needed to avoid variations in the foregoing and if Owner does not elect a full replacement, it assumes the risk and of said variations.

STORAGE: If materials for the Project are ready to install and the Owner is not ready, a grace period of 15 days will be given. After 15 days, a delay fee of $100 per week will apply. After 30 days, a delay fee of $250 per week will apply. These fees shall be paid monthly and shall be paid in advance of the Work continuing.

HOA's AND CONDOS: Owner is responsible for providing Contractor with the proper contact information for the person in charge of coordinating and approving construction. Contractor shall not begin its work or order materials until the necessary HOA or CA approvals are received unless Owner instructs Contractor in writing to commence without said approval, and if so, Owner bears all of the risk if the approval is delayed or never arrives. Owner is responsible to read and understand the bylaws and rules of allowed upgrades, colors, styles and Contractor, by to agreeing to sell and install a product, does not warrant or represent that it will be approved by the HOA or CA. Owner bears all of the risk of its selection of any product, color and style.

RELATIONSHIP OF THE PARTIES: The Owner agrees to furnish and approve, in a timely manner, information requested by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents. The Owner shall, at the request of the Contractor, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a continuing condition precedent to the Contractor's further obligation under this Contract.

MISCELLANEOUS: In the event that any term, provision, or part of the Contract is held to be illegal, invalid or unenforceable, such term, provision, or part shall be deemed severed from the Contract and the remaining terms, provisions and parts shall remain unaffected thereby. Where the context requires, neutral terms used herein shall include the masculine and feminine, and singular terms shall include the plural, and vice versa. This Contract, including the documents incorporated herein by reference, embodies the entire agreement of the parties and supersedes all prior negotiations, agreements and understandings relating to the subject matter hereof. No requirement of this Contract may be waived or modified except by a written document signed by at least one authorized representative of each party. The captions of the articles in this Contract are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of any article or paragraph herein. All reference to days shall mean calendar days unless otherwise specified. All notices called for in this Agreement shall be in writing and addressed to one or more of the authorized representatives set forth in this Agreement. The person signing this Contract represents and warrants that he/she is the lawful fee simple owner of the property where the Work is being performed or is an expressly authorized agent for the owner of the property. Notwithstanding, the party signing this Contract agrees to be individually and personally bound by the terms and conditions contained herein and shall timely pay the Contractor for the Work and materials furnished as set forth herein.

WARRANTY: The Contractor warrants to the Owner only that all materials furnished by it will be of standard quality, type and condition, free from defects, and will be installed or applied in a good workmanlike manner, in reasonable compliance with manufacturer's published application instructions. Should any defect occur within the warranty period, due to defective materials or workmanship supplied by the Contractor, the Contractor hereby agrees to repair same without charge, upon receipt of proper notice in writing, by certified mail, providing that the Contractor has been paid in full and the Owner was not in breach or terminated this Contract. There is no warranty and same shall be void if the total contract price, as amended, is not paid in full or if the Work or work or materials supplied by the Contractor are abused, not maintained or modified in any way. All warranty work shall be performed during normal business hours and within a reasonable time following written notice to the Contractor. Contractor shall provide no warranty whatsoever on Owner's supplied materials and/or on the work and/or materials of the Owner's alternate contractor(s) and/or specialty contractor(s).

FLORIDA RESIDENTIAL CONSTRUCTION DISCLOSURES

## FLORIDA'S CONSTRUCTION LIEN LAW

NOTICE: ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR

...MENT, EVEN IF YOU HAVE ALREADY PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. TO PROTECT YOURSELF, YOU SHOULD STIPULATE IN THIS CONTRACT THAT BEFORE ANY PAYMENT IS MADE, YOUR CONTRACTOR IS REQUIRED TO PROVIDE YOU WITH A WRITTEN RELEASE OF LIEN FROM ANY PERSON OR COMPANY THAT HAS PROVIDED TO YOU A "NOTICE TO OWNER." FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX, AND IT IS RECOMMENDED THAT YOU CONSULT AN ATTORNEY.

FLORIDA'S HOMEOWNER'S CONSTRUCTION RECOVERY FUND

PAYMENT, UP TO A LIMITED AMOUNT, MAY BE AVAILABLE FROM THE FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: Construction Industry Licensing Board, 2601 Blair Stone Road, Tallahassee, FL 32399: phone (850) 487-1395.

CONSTRUCTION DEFECTS NOTICE

NOTICE: ANY CLAIMS FOR CONSTRUCTION DEFECTS ARE SUBJECT TO THE NOTICE AND CURE PROVISIONS OF CHAPTER 558, FLORIDA STATUTES.

| | | |
|---|---|---|
| Owner/Agent | X [signature] | Date: 08/02/23 |
| Owner/Agent | X | Date: |

FLORIDA RIGHT TO CANCEL DISCLOSURE

BUYER'S RIGHT TO CANCEL

THIS IS A HOME SOLICITATION SALE, AND IF YOU DO NOT WANT THE GOODS OR SERVICES, YOU MAY CANCEL THIS AGREEMENT BY PROVIDING WRITTEN NOTICE TO THE ~~SELLER~~ contractor IN PERSON, BY TELEGRAM, OR BY MAIL. THIS NOTICE MUST INDICATE THAT YOU DO NOT WANT THE GOODS OR SERVICES AND MUST BE DELIVERED OR POSTMARKED BEFORE MIDNIGHT OF THE THIRD BUSINESS DAY AFTER YOU SIGN THIS AGREEMENT. IF YOU CANCEL THIS AGREEMENT, THE ~~SELLER~~ MAY NOT KEEP ALL OR PART OF ANY CASH DOWN PAYMENT.

| | | |
|---|---|---|
| Owner/Agent | X [signature] | Date: 08/02/23 |
| Owner/Agent | X | Date: |

**Notes:**

***Thank You For Your Business!***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:24-cv-60382-DSL

JESSICA PIAFSKY, an individual,

Plaintiff,

v.

MB HOME IMPROVEMENTS INC. a Florida Corporation, MAXIM BOHADANA, an Individual, ROI NEEMAN, an Individual and CONSTRUCTION FORT LAUDERDALE, INC. d/b/a MB HOME IMPROVEMENTS, a Florida Corporation,

Defendants

**FIRST AMENDED COMPLAINT**

# EXHIBIT B

# INVOICE / WORK ORDER

MB Home Improvements
4814 SW 34th Terrace
Fort Lauderdale, FL 33312, USA
(954) 609-8006
Constructionfortlauderdale@gmail.com

| | |
|---|---|
| Invoice # | 96 |
| Date | Mon Nov 20 2023 |
| Balance | **0** |
| Due On | Mon Nov 20 2023 |

**Bill To:**
Jessica Piafsky
3272 SW 51st St
Fort Lauderdale, Florida 33312
(917) 282-9500
Jessicapiafsky@gmail.com

**Service Location:**

| Description | QTY | Price | Amount |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **Payment terms**<br>$20,000 DEPOSIT PART 1, AT SIGNATURE<br>$67,000 DEPOSIT PART 2 (TOTAL 30%) 8/16/2023 PAID<br>$8931.00 BEGIN DATE (10/11/2023)<br>$6,019 WEEKLY PAY FOR 8 WEEKS.<br>$32,000 ON HOLD AS OF NOW. (WILL BE USED IN THE NEAR FUTURE ONCE WE CAN APPLY FOR PERMITS FOR OUTDOOR PART OF THE PROJECT.)<br>$25,000 WHEN JOB IS COMPLETE.<br>NEW JOB TOTAL INCLUDING KITCHEN UPGRADES.<br>$296275 (Original)<br>-$1525 (Window change credit)<br>-$8500 (Window Modification removal from original contract removed)<br>-$2,000 (Crown molding)<br>-$22,000 (Kitchen payment)<br>-$9,960 (Windows Check)<br>$252,290<br>PAYMENTS MUST BE MADE BEFORE 10AM ON PAYMENT DAYS!<br>IF PAYMENT IS NOT REMITTED ON TIME, WORK WILL BE DELAYED.<br>CASH, CHECK, ZELLE (9546098006),CREDIT CARD ADD 4%, SUNBIT ADD 6% | 1.00 | 0.00 | 0.00 |

| | | | |
|---|---|---|---|
| **Wire Trasnsfer Scheduled Payments**<br>$9,145 + $15 wire transfer fee = $9,160<br>*Due every Wednesday*<br>October 18, 2023<br>$9,145 + $15 wire transfer fee = $9,160 (PAID)<br>October 25, 2023<br>$9,145 + $15 wire transfer fee = $9,160 (PAID)<br>November 1, 2023<br>$9,145 + $15 wire transfer fee = $9,160 (PAID)<br>November 8, 2023<br>$9,145 + $15 wire transfer fee = $9,160 (PAID)<br>November 15, 2023<br>$9,145 + $15 wire transfer fee = $9,160 (PAID)<br>November 17, 2023<br>$7,000 (PAID)<br>November 22, 2023<br>$6,019 + $15 wire transfer fee = $6,034<br>November 29, 2023<br>$6,019 + $15 wire transfer fee = $6,034<br>December 6, 2023<br>$6,019 + $15 wire transfer fee = $6,034<br>December 13, 2023<br>$6,019 + $15 wire transfer fee = $6,034<br>December 20, 2023<br>$6,019 + $15 wire transfer fee = $6,034<br>December 27, 2023<br>$6,019 + $15 wire transfer fee = $6,034<br>January 3, 2024<br>$6,019 + $15 wire transfer fee = $6,034<br>January 10, 2024<br>$6,019 + $15 wire transfer fee = $6,034 | 1.00 | 0.00 | 0.00 |

| | |
|---|---|
| Sub total | 0.00 |
| Tax | 0.00 |
| Tax Rate | 0.000% |
| Total | 0.00 |
| Balance | 0.00 |

TERMS AND CONDITIONS

Contractor and Owner, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged, hereby agree as follows on the date set forth below:

CONTRACT DOCUMENTS: Contractor is MB HOME IMPROVEMENTS, INC. and has license numbers CBC1265305 and CCC1334811. The Contract Documents consist of this Contract and the documents set forth above and those documents referenced including the Florida Construction Disclosures and the Right of Rescission. The Contract Documents also include any modifications of this Contract subsequent to its execution. These documents form the Contract and are as fully a part of the Contract as if attached to this Contract. The Contract represents the entire agreement between the parties and supersedes prior negotiations, representations or agreements, either written or oral. If anything in the other Contract Documents is inconsistent with this Contract, this Contract shall govern. The Contractor shall be furnished, free of charge, such copies of any and all drawings, plans, and specifications as are reasonably necessary for execution of the Work.

WORK: The term "Work" means the materials and services expressly set forth in the Contract Documents. The Work may constitute the whole or a part of the Project. The scope of Work may be increased, decreased, changed or modified by agreement of the parties. All listed limitations and exclusions are specifically excluded from this Contract, the Work and the Contract Price. All allowances are an estimate and costs and fees in excess of an allowance item shall be billed and paid as a Change Order.

CONTRACT PRICE: Subject to exclusions and allowances, Change Orders, claims and other additions and deductions as set forth herein, Owner shall pay to Contractor the Contract Price. A punch list or warranty items or issues do not constitute a basis for withholding payment to the Contractor. All payment shall be made in good U.S. funds. Unpaid amounts shall bear interest from the date payment is due at 1.5% per month.

PROGRESS PAYMENTS: Owner shall pay to Contractor any deposit no later than (5) days of the last party executing this Agreement. Payment shall be made to Contractor as otherwise set forth in this agreement or within seven (7) days after receiving an invoice or payment application, whichever is earlier. Time is of the essence with respect to all progress payments by Owner.

FINAL PAYMENT: A final payment, consisting of the unpaid balance of the Contract Price shall be made as set forth in this agreement or within seven (7) days after substantial completion of the Work by Contractor, whichever is earlier. Time is of the essence with respect to final payment by Owner.

OWNER REPRESENTATIVE: If multiple Owners sign this agreement, any Owner has full authority to direct the Contractor to do extra work or make changes to the scope of Work. Any and all instructions (written or oral), acts, or omissions of the any Owner shall bind the Owner as if made by all Owners.

COOPERATION WITH LENDER: Owner shall cooperate with any lending entity or entities providing financing for the Project and shall supply such information and certifications as may reasonably be required, from time to time, in order that Owner can satisfy conditions for lender to make payments to Contractor. Owner shall not hinder or delay the approval of the work to delay or prevent payment to Contractor.

ACCEPTANCE: Owner shall immediately inspect the Work when it has been completed and any aspect of the Work not acceptable to the Owner must be specifically noticed in writing to the Contractor within five calendar days following completion of that aspect of the Work or the Work whole. Owner's failure to provide written notice to Contractor of any issues, claims or defects within 14 days of Owner's beneficial use of the Project and Work, or the issuance of a certificate of completion or certificate of occupancy, whichever is sooner. The contractor shall be given a reasonable opportunity to address the issue (as set forth herein and pursuant to Florida law).

TIME: Contractor shall achieve substantial completion and final completion of the entire Work in a reasonable amount of time subject to the conditions and circumstances surrounding the Work and Project. The Owner shall make the Project available and take all steps necessary to allow the Contractor to perform the Work on the Project not less than fifty hours per week, Monday through Saturday, 7AM to 5PM. Any and all substantial completion and final completion dates provided are merely estimates.

CHANGE ORDERS: Owner and Contractor may agree to changes, additions, or deletions in the scope of work without invalidating this Contract ("Change Order"). Contractor and Owner shall agree on said change order work and costs in writing and Contractor shall thereupon perform the changed Work in accordance with the terms of this Contract, Contract Documents and the Change Order. The contractor shall not be obligated to perform any changed work prior to mutual agreement of the parties. However, Contractor may rely on an Owner's oral directive to perform changed work and the Owner remains obligated to pay for same.

The Owner shall reimburse Contractor for all costs and fees incurred in connection with permits, permit processing, permit expediting, testing, inspections, fines, and code violation payments related to the Work and said costs shall be in excess of the contract price. In the event of increases in the cost of materials to the Contractor after the date of this Contract, the Contractor shall pass on such increases as extra costs which the Owner agrees to pay as an additive change. If material or equipment, which the Contractor is required to furnish under this Contract, become unavailable, either temporarily or permanently, subsequent to the execution of the Contract, through causes beyond its direct control, then in the case of temporary unavailability, the contract time shall be extended for such period of time as the Contractor shall be delayed by such unavailability; and in the case of permanent unavailability, the Contractor shall be excused from the requirement of furnishing such materials or equipment. The Owner agrees to pay the Contractor any increase in cost between the cost of the material or equipment or furnishing (as an additive change) which has become permanently unavailable and the cost of the closest substitute which is then reasonably available.

| | | |
|---|---|---|
| Owner/Agent | X | Date: |
| Owner/Agent | X | Date: |
| Contractor/Agent | X | Date: |

Contractor's sole obligation is to perform the Work actually depicted and described in the Contract Documents and/or plans and specifications or the Work directed by Owner. The Contractor is not responsible for missing or conflicting information or components from the Contract Documents, plans and/or specifications or for the constructability, performance, or use of the Contract Documents, plans, specifications, or the Project. The Contractor has not and shall not interpret the Contract Documents, plans, specifications, or Project design in order to fill in missing information or confirm compliance with the applicable building code, life safety systems, or the Americans with Disabilities Act (ADA) which the Owner agrees are its obligations.

DEFAULT: Unless permitted by Florida law, this Contract is not cancelable by Owner. If Owner (or those under its direct or indirect control) through active or passive acts, omissions, or negligence prevents, slows, or delays, the Contractor's progress of the Work (for any reason whatsoever) or causes Work to be done out of sequence, or if the Owner fails to make timely payment to the Contractor, the Owner shall be in default of this Contract. Upon default of this Contract by Owner, Contractor shall have no further obligations under this Contract and the Owner shall immediately pay to the Contractor the portion of the Contract Price due and outstanding at the time of default plus Contractor's lost profit on the uncompleted portion of the Work. Contractor may cancel this Contract at any time and for no reason, subject to returning to Owner the unused portion of any payments made.

DISPUTES: If a dispute should arise between Owner and Contractor under or relating to the Work or the Contract, or the breach thereof, then either party may seek redress of its grievances as to such disputes at law or in equity in a court of competent jurisdiction located in Broward County, Florida. This Contract shall be governed and construed under the laws of the State of Florida. Each of the parties hereto consents to the jurisdiction and the venue of any such action in Broward County for all purposes in connection with this Contract. THE CONTRACTOR AND OWNER WAIVE THEIR RIGHT TO A JURY TRIAL IN ANY AND ALL ACTIONS AND PROCEEDINGS. The prevailing party in any such suit or defense shall be entitled to recover from the other party any and all costs and expenses, including but not limited to reasonable attorney's fees and costs, incurred in having to enforce its rights hereunder, with or without suit.

SITE CONDITIONS: The Contractor employees shall not be required to Work in hazardous conditions and the Owner agrees to mitigate such conditions prior to commencement of the Work. Contractor is not responsible or liable for vandalism, theft, or damage to the Work or surrounding areas no matter how caused, including, without limitation, wind, rain, hail, hurricanes, or acts of God or third parties. The Contractor is not responsible for and shall be entitled to an additive Change Order for any and all non-visible or unforeseen site conditions, be they underground, under-floor, behind-wall, under roof, above ceiling, or the like, or any and all other site conditions that are not disclosed to Contractor in writing prior to construction. The contractor is not responsible for reinstalling any alarm system it may have removed. The owner shall, at its expense, contact their alarm company to reinstall same. Owner shall secure and safeguard all personal property, jewelry, valuables, and pets during work hours. The contractor is not responsible for damage or theft to personal property that was left in the work area or the well-being of pets. The contractor shall be given, at no cost, access to water, electricity and lighting, and access to the service panel. The trash receptacle used during the Project is solely for the purpose of collecting construction-related refuse and is not to be used by the Owner. Owner agrees to pay all costs arising from unforeseen issues such as unsafe or illegal conditions, rot or mold, inspector requirements, overlooked conditions, identifying and removing hazardous materials (lead paint, solvents, asbestos, etc.) before or after the Project has begun, all as a Change Order. Contractor is not responsible for warping of material, natural grain and texture in variations of wood and stone, defects in materials, equipment or appliances covered by the manufacturer, driveway cracks formed after concrete/asphalt has set or standing water, damage due to heat, sunlight or water, rust, mold, termites or wood rot, any defects arising from work done after inspection by Owner, Regarding fencing and concrete work, underground digging, damage to sprinkler systems, main water lines, AC lines, drain lines or cable/internet/phone lines.

LIMITATION OF LIABILITY AND INDEMNIFICATION: The Contractor' liability in any action related to this Contract or the Work performed hereunder, shall in no event exceed the amount of the Contract Price and such liability may be fully discharged by a reimbursement of any payments received by the Contractor under this Contract. This limitation of liability is expressly intended to apply to all types of claims, including but not limited to claims for the Contractor's own negligence.

EXCEPT AS SPECIFICALLY PROVIDED HEREIN, IF ANY, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THE CONTRACTOR WILL NOT BE RESPONSIBLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES AND ANY CLAIM AGAINST THE CONTRACTOR OR ITS AGENTS, OFFICERS, AND EMPLOYEES SHALL BE LIMITED TO THE REPLACEMENT VALUE OF ITS WORK AND ONLY IF SUCH WORK OR MATERIAL IS FOUND TO BE DEFECTIVE.

Notwithstanding anything else to the contrary, the Contractor shall have no liability or responsibility for any damages and/or delays caused by others or for damages or delays either before commencement of, or during said Work, or after said Work, caused by structural faults, temperature changes and differentials, sun and weather exposure, strikes, material shortages, labor shortages, war, Acts of God, rain, wind, wind storms, fire, floods, theft, vandalism, hurricanes or any event beyond its direct and immediate control. Contractor shall not be responsible for any damage which has or may have occurred prior to the commencement of Contractor's Work, including, without limitation, drywall, wood, furniture, fixtures, insulation, and paint. Any interruption in the Work which results in lost time and/or material and is not the sole and direct fault of the Contractor, shall be paid by the Owner as an extra cost according to time and material lost as an additive Change.

If any claim is made for damage or injury including death, the Owner agrees to indemnify and hold the Contractor harmless from and against such claim and all loss, damage, injury and expense (including reasonable attorney's fees and costs) that the Contractor may sustain when such claim is directly or indirectly based or related to the Owner's or its agents', contractors', or employees' negligent, intentional or wrongful acts or omissions.

OWNER SUPPLIED MATERIALS AND LABOR: If the Owner, before or during the course of the Work, purchases its own materials and/or supplies and/or directly retains the labor and/or services of an alternate contractor(s) and/or specialty contractor(s) (herein collectively "Owner Supplied Materials and Labor"), then Owner shall (1) be solely responsible for the timely delivery, coordination, insurance, protection, and security of and for the Owner Supplied Materials and Labor and (2) take all steps necessary to not adversely affect the Contractor's construction schedule or the sequence of the Contractor's Work. At Owner's sole cost and expense, Owner shall fully abide by and comply with all of Contractor's requests that any or all Owner Supplied Materials and Labor be furnished or held (and stored and not delivered/commenced) at the dates, times, and locations designated by Contractor at its sole and absolute discretion. The contractor shall have sole discretion to allow or refuse to allow any trade from working under its permit.

Additionally, all such labor and/or services of an alternate contractor(s) and/or specialty contractor(s) shall be performed under permits, licenses, and insurance separate and apart from the permits, license, and insurance covering the Work of the Contractor under this Agreement. The Owner hereby agrees to defend, indemnify and hold Contractor harmless from any and all costs, fees, expenses, damages, losses, impacts, and injuries (including death) caused by the Owner's alternate contractor(s) and/or specialty contractor(s) for any reason whatsoever. Notwithstanding the foregoing, the Owner shall, within five calendar days of retaining said alternate contractor(s) and/or specialty contractor(s), take all steps necessary to cause said alternate contractor(s) and/or specialty contractor(s) to furnish to Contractor valid, effective, and enforceable certificates of insurance naming Contractor as an additional insured on said alternate contractor(s) and/or specialty contractor(s) policy. Said certificate and policy shall specifically prohibit said alternate contractor(s) and/or specialty contractor(s) from amending or canceling said policy without 30 days prior written notice to Contractor and shall be issued in amounts no less than $1,000,000 by an A+ or better AM Best rated company licensed in Florida. Contractor, at its sole and absolute discretion, may slow or stop all Work until such time as said insurance certificates are provided. The Owner shall be responsible for any and all incurred demobilization and/or remobilization costs, fees, and/or impacts suffered by Contractor as an additive Change Order.

SUBCONTRACTS: Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The contractor has the absolute and sole discretion to select and hire the subcontractors and suppliers of its choice. Owner shall not interfere with or direct the work of said subcontractors.

MATCHING: Contractor will use reasonable efforts to match the color, finish, hue, texture, size, shape, dimension, make, model and the look and feel of materials, but there will be differences and said differences shall not be a basis to reject Work or refuse to make payment. Owner is given notice now that a full replacement is needed to avoid variations in the foregoing and if Owner does not elect a full replacement, it assumes the risk and of said variations.

STORAGE: If materials for the Project are ready to install and the Owner is not ready, a grace period of 15 days will be given. After 15 days, a delay fee of $100 per week will apply. After 30 days, a delay fee of $250 per week will apply. These fees shall be paid monthly and shall be paid in advance of the Work continuing.

HOA's AND CONDOS: Owner is responsible for providing Contractor with the proper contact information for the person in charge of coordinating and approving construction. Contractor shall not begin its work or order materials until the necessary HOA or CA approvals are received unless Owner instructs Contractor in writing to commence without said approval, and if so, Owner bears all of the risk if the approval is delayed or never arrives. Owner is responsible to read and understand the bylaws and rules of allowed upgrades, colors, styles and Contractor, by to agreeing to sell and install a product, does not warrant or represent that it will be approved by the HOA or CA. Owner bears all of the risk of its selection of any product, color and style.

RELATIONSHIP OF THE PARTIES: The Owner agrees to furnish and approve, in a timely manner, information requested by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents. The Owner shall, at the request of the Contractor, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a continuing condition precedent to the Contractor's further obligation under this Contract.

MISCELLANEOUS: In the event that any term, provision, or part of the Contract is held to be illegal, invalid or unenforceable, such term, provision, or part shall be deemed severed from the Contract and the remaining terms, provisions and parts shall remain unaffected thereby. Where the context requires, neutral terms used herein shall include the masculine and feminine, and singular terms shall include the plural, and vice versa. This Contract, including the documents incorporated herein by reference, embodies the entire agreement of the parties and supersedes all prior negotiations, agreements and understandings relating to the subject matter hereof. No requirement of this Contract may be waived or modified except by a written document signed by at least one authorized representative of each party. The captions of the articles in this Contract are inserted only as a matter of

convenience and for reference and in no way define, limit or describe the scope of any article or paragraph herein. All reference to days shall mean calendar days unless otherwise specified. All notices called for in this Agreement shall be in writing and addressed to one or more of the authorized representatives set forth in this Agreement. The person signing this Contract represents and warrants that he/she is the lawful fee simple owner of the property where the Work is being performed or is an expressly authorized agent for the owner of the property. Notwithstanding, the party signing this Contract agrees to be individually and personally bound by the terms and conditions contained herein and shall timely pay the Contractor for the Work and materials furnished as set forth herein.

WARRANTY: The Contractor warrants to the Owner only that all materials furnished by it will be of standard quality, type and condition, free from defects, and will be installed or applied in a good workmanlike manner, in reasonable compliance with manufacturer's published application instructions. Should any defect occur within the warranty period, due to defective materials or workmanship supplied by the Contractor, the Contractor hereby agrees to repair same without charge, upon receipt of proper notice in writing, by certified mail, providing that the Contractor has been paid in full and the Owner was not in breach or terminated this Contract. There is no warranty and same shall be void if the total contract price, as amended, is not paid in full or if the Work or work or materials supplied by the Contractor are abused, not maintained or modified in any way. All warranty work shall be performed during normal business hours and within a reasonable time following written notice to the Contractor. Contractor shall provide no warranty whatsoever on Owner's supplied materials and/or on the work and/or materials of the Owner's alternate contractor(s) and/or specialty contractor(s).

## FLORIDA RESIDENTIAL CONSTRUCTION DISCLOSURES

## FLORIDA'S CONSTRUCTION LIEN LAW

NOTICE: ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE ALREADY PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. TO PROTECT YOURSELF, YOU SHOULD STIPULATE IN THIS CONTRACT THAT BEFORE ANY PAYMENT IS MADE, YOUR CONTRACTOR IS REQUIRED TO PROVIDE YOU WITH A WRITTEN RELEASE OF LIEN FROM ANY PERSON OR COMPANY THAT HAS PROVIDED TO YOU A "NOTICE TO OWNER." FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX, AND IT IS RECOMMENDED THAT YOU CONSULT AN ATTORNEY.

### FLORIDA'S HOMEOWNER'S CONSTRUCTION RECOVERY FUND

PAYMENT, UP TO A LIMITED AMOUNT, MAY BE AVAILABLE FROM THE FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A LICENSED CONTRACTOR.

FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: Construction Industry Licensing Board, 2601 Blair Stone Road, Tallahassee, FL 32399: phone (850) 487-1395.

CONSTRUCTION DEFECTS NOTICE

NOTICE: ANY CLAIMS FOR CONSTRUCTION DEFECTS ARE SUBJECT TO THE NOTICE AND CURE PROVISIONS OF CHAPTER 558, FLORIDA STATUTES.

| | | |
|---|---|---|
| Owner/Agent | X | Date: |
| Owner/Agent | X | Date: |

FLORIDA RIGHT TO CANCEL DISCLOSURE

BUYER'S RIGHT TO CANCEL

THIS IS A HOME SOLICITATION SALE, AND IF YOU DO NOT WANT THE GOODS OR SERVICES, YOU MAY CANCEL THIS AGREEMENT BY PROVIDING WRITTEN NOTICE TO THE SELLER IN PERSON, BY TELEGRAM, OR BY MAIL. THIS NOTICE MUST INDICATE THAT YOU DO NOT WANT THE GOODS OR SERVICES AND MUST BE DELIVERED OR POSTMARKED BEFORE MIDNIGHT OF THE THIRD BUSINESS DAY AFTER YOU SIGN THIS AGREEMENT. IF YOU CANCEL THIS AGREEMENT, THE SELLER MAY NOT KEEP ALL OR PART OF ANY CASH DOWN PAYMENT.

| | | |
|---|---|---|
| Owner/Agent | X | Date: |
| Owner/Agent | X | Date: |

**Notes:**

$32,000 ON HOLD AS OF NOW. (WILL BE USED IN THE NEAR FUTURE ONCE WE CAN APPLY FOR PERMITS FOR OUTDOOR PART OF THE PROJECT.)

Money will come into play once we have engineer plans. This means that we will soon move forward with the pool contractor once we get those plans. (Pool contractors usually have their engineers that they use so we will most likely go with that one). He will give you a few tiles for you to decide what you would like. (Tile obviously not included in the price) And he will also begin the permit process once we are ready to move forward. This money will go part of a deposit to him for that and for anything else necessary. And for the rest of the outdoor work.

***Thank You For Your Business!***